## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| IN RE: | ) |
| | ) **CASE NO. 16-03942** |
| **BRACE E. BARBER, AND** | ) |
| **NATASHA L. BARBER,** | ) **JUDGE MARIAN F. HARRISON** |
| | ) |
| Debtors. | ) **CHAPTER 7** |
| | ) |
| **ERIK D. LAWRENCE, VIGILANT** | ) **ADV. NO. 16-90268** |
| **SECURITY SERVICES, LLC, and** | ) |
| **PHILIPPI PROPERTY GROUP, LLC,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| **BRACE E. BARBER,** | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |

---

## MEMORANDUM OPINION

---

The trial of this case resembled a "who-done-it." Who owns the four Russian belt-fed machine guns and twelve AK-47 assault rifles? Where are these guns? Who absconded with the guns and other personal property? Was there an unauthorized use of another's credit cards without an intent to indemnify the responsible guarantor?

1

This matter is before the Court on the complaint filed by Erik D. Lawrence ("Lawrence") and his companies, Vigilant Security Services, LLC ("Vigilant"), and Philippi Property Group, LLC's ("Philippi") (collectively "Plaintiffs") to determine the dischargeability of their claims against Debtor/Defendant Brace E. Barber ("Barber"). The complaint alleges that Barber took guns and other personal property entrusted to him by Lawrence and continued to use company credit cards for which Lawrence was the guarantor. The complaint asserts that the Plaintiffs' claims are nondischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6). For the following reasons, which represent the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Bankruptcy Procedure 7052, the Court finds that Plaintiffs' gun claim is nondischargeable but that the personal property and credit card claims are dischargeable.

## I.  BACKGROUND

## A. PROCEDURAL HISTORY

On May 31, 2016, Brace E. Barber and Natasha L. Barber ("Debtors") filed a joint Chapter 7 petition. On September 19, 2016, Plaintiffs Lawrence and Philippi[1] initiated this adversary proceeding by filing their Complaint against Barber. The Debtors received a discharge on January 10, 2017. On November 13, 2018, Plaintiffs filed an Amended Complaint. The Amended Complaint prays for judgment of nondischargeability against Barber for all amounts owed to Plaintiffs. On December 20, 2018, Plaintiffs took the

---

[1] Vigilant was added as a party in the Plaintiffs' amended complaint.

deposition of John Hickman ("Hickman").[2] A bench trial was held on January 17, 2019. The questions posed at trial in this adversary proceeding are: (1) whether Barber is liable for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny, which are nondischargeable pursuant to 11 U.S.C. § 523(a)(4); and (2) whether Barber is liable to Plaintiffs for willful and malicious injury to Plaintiffs or to the property of Plaintiffs, which is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).[3]

## B. THE PARTIES

Lawrence is a resident of West Virginia who oversees a security company that does consulting and training for the United States Government. Vigilant, owned by Lawrence, is a company specializing in executive protection, where he teaches security procedures to different corporate entities and/or military agencies. Philippi, a limited liability company owned by Lawrence, owns certain assets, including real property, vehicles, and personal property.

Barber is an individual who resides in the state of Tennessee. Barber is the President and Incorporator of General Stability, Inc. ("General Stability"), a corporation organized

---

[2] At trial, Barber objected to the admission of Hickman's deposition on grounds that it was taken improperly. The deposition was a telephonic deposition taken without Barber or the Court's consent. The court reporter was also not in the same physical location as the deponent, who was alone in another state during the deposition. This Court took the question of admissibility under advisement. However, the parties later stipulated to the admissibility of the deposition.

[3] Although Barber briefed the Court on exceptions to discharge under 11 U.S.C. § 523(a)(2), Plaintiffs do not argue their case under that subsection. Therefore, the Court will not address 11 U.S.C. § 523(a)(2).

under the laws of the State of Delaware and doing business in the State of West Virginia, including Barbour County, West Virginia.  Barber and General Stability entered into the Buy Sell Agreement with Lawrence to purchase Blackheart International, LLC ("Blackheart").  Barber became President of Blackheart in connection with the transactions discussed in greater detail below.  Blackheart was a military equipment logistics company that would receive quotes from government agencies or military units for equipment and would provide the agencies or units with a quoted price and availability.  Tom Cornejo ("Cornejo") was an employee at General Stability and assisted Blackheart with its operations after Barber became the President of Blackheart.  Cornejo worked under the direction of Barber.  Kirk Newton ("Newton") was also an employee at Blackheart before and after the company was sold to Barber.  After Blackheart was sold to Barber, Newton worked under the direction of Barber.

Hickman ("Hickman") is a resident of Mississippi.  He is the Vice President of a security company in McLean, Virginia.  He was the initial owner of the guns at issue in this case.

### C. BUY/SELL TRANSACTION

Lawrence and Barber first met in January 2013 at a gun dealer/distributor show in Las Vegas.  While in Las Vegas, Lawrence and Barber decided to enter into a business transaction.

4

In the Buy Sell Agreement, dated February 20, 2013, Barber and General Stability agreed to buy 100% of the ownership of Blackheart and 100% of Vigilant from Lawrence. On April 1, 2013, the sale of Blackheart and Vigilant was completed, and Barber became the President and owner of Blackheart. As of April 1, 2013, all employees at Blackheart started reporting to Barber. After the closing, Philippi leased Blackheart certain premises, including one floor of a warehouse in Barbour County, West Virginia. On April 22, 2013, General Stability assigned Lawrence a 51% interest in Blackheart.

Shortly after the closing, Barber and Steaphan Weir ("Weir")[4] became unable to make payments as promised. As a result, Barber, Weir, and Lawrence entered into a forbearance agreement on June 1, 2013. In the Agreement Pursuant to Buy Sell Agreement ("June 1, 2013, Agreement"), it was agreed that Vigilant would be sold back to Lawrence. Additionally, under the June 1, 2013, Agreement, Lawrence transferred to General Stability his 51% ownership interest in Blackheart that he previously acquired on April 22, 2013. Lastly, under the June 1, 2013, Agreement, Barber and Weir personally and individually guaranteed the performance of all obligations, payments, and debts owed under the June 1, 2013, Agreement, and all prior agreements.

---

[4]Although Lawrence testified that Weir was a party to the original Buy Sell Agreement, Weir was not actually named in the Buy Sell Agreement. Weir and Barber are both listed in the forbearance agreement as incorporators and representatives of General Stability.

## D. GUNS

In 2013, Lawrence learned that Hickman, his friend and business colleague, had a foreign gun familiarization training program that was going out of business. Because his business was ending, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") rules required Hickman to either destroy the guns he used in his business or transfer the guns to another authorized dealer. As a result, Hickman and Lawrence agreed that the guns would be given to Lawrence to possess and own. The agreement included a total of sixteen guns: four PKMs, which are Russian belt-fed machine guns, and twelve AK-47s, which are assault rifles.

Lawrence testified that the sixteen guns have a total current market value of $70,000. Because it is difficult to procure the parts kits to make them, Lawrence testified that the guns are hard to make. These types of guns are rare in the United States and continue to increase in value over time. As part of his consulting work done through Vigilant, Lawrence taught military units how to use foreign guns, including PKMs and AK-47s. Hickman also testified in his deposition that "all sixteen weapons are worth about $70,000 to replace."

Lawrence and Hickman entered into a verbal agreement that if Lawrence used the guns for training, he would pay Hickman a rental fee until the value of the weapons was paid. Lawrence then applied for a Federal Firearms License ("FFL") in the name of Vigilant so that Vigilant could use the guns for business purposes in connection with the

6

training classes offered by Lawrence. Lawrence could not keep the guns until such time as Vigilant's FFL application was finalized so it was agreed that Barber would store the guns in Blackheart's gun vault until then. Hickman brought the guns to Barber's home outside Nashville, Tennessee, so that Barber could drive the guns to West Virginia and pass them on to Lawrence. Upon arriving in West Virginia, the guns were stored in Blackheart's gun vault in the warehouse owned by Philippi. Lawrence confirmed that all of the guns were placed in the gun vault by checking the serial numbers. The guns were also noted in Blackheart's "bound book," which is a mandatory disposition book that each gun dealer must maintain. Specifically, under ATF regulations, a gun dealer must note in his bound book any guns he possesses for more than twenty-four hours. A bound book is not a list of the dealer's assets, but rather a record of the possession and disposition of guns at a given point in time. *See* 27 C.F.R. § 478.121(c).

On December 30, 2013, Vigilant's FFL application was approved, and an FFL license was issued to Vigilant. Upon receiving the FFL, Lawrence asked Barber to transfer the sixteen guns to him. Barber did not transfer the guns to Lawrence. Due to Lawrence's deteriorating relationship with Barber at the time, Lawrence asked Hickman to follow up with Barber about transferring the guns to Lawrence.

Hickman testified in his deposition that he made repeated inquires with Barber regarding the status of transferring the guns to Lawrence. Lawrence and Hickman eventually discussed that the guns could be "cut" and returned as parts. The guns were

7

never returned to Lawrence or Hickman in any form. Lawrence has had to rent guns from other competitors or partners in order to run his training sessions.

Barber initially testified at trial and claimed in his 2017 interrogatory responses that Viqen, LLC, a Blackheart creditor, took possession of the guns on May 12, 2015, when it seized Blackheart's collateral after Blackheart defaulted on its debts. He claimed that he had no knowledge of the location or disposition of the guns after that date. Yet, emails were introduced at trial showing that after the alleged seizure, emails were exchanged between Barber and his employees indicating that Blackheart still had the guns in its vault. Two months later, on July 23, 2015, Barber emailed Hickman, again indicating that the guns were in the vault and not seized by Viqen. When cross-examined regarding these emails, Barber admitted that "[i]f I was corresponding after that date, clearly I had knowledge of where the guns were at that time." There was no concrete proof as to what happened to the guns, and it is unclear where the guns eventually ended up. The only clear fact regarding the guns is that Barber was not a credible witness.

## E. CREDIT CARDS

Approximately ten years before entering into the business transaction with Barber, Lawrence opened up credit card accounts for Blackheart business purposes. Lawrence also provided certain Blackheart employees with company credit cards issued in their names to be used for approved Blackheart business transactions. These employees continued to

work for Blackheart after the business was sold to Barber. Lawrence was the guarantor of the Blackheart credit card accounts.

As part of the business transaction between Lawrence and Barber, it was agreed that the credit cards would continue to be used for approved business purchases until Barber could assume the role as guarantor for the accounts by completing credit applications for each card. Furthermore, it was agreed that Barber would pay on behalf of Lawrence any charges made on the accounts before Barber took over as guarantor. Barber's indemnification obligation was outlined in the June 1, 2013, Agreement:

> That Purchaser collectively and individually agrees to indemnify, defend and hold harmless and pay on behalf of Erik D. Lawrence any claims made against and obligations to pay Erik D. Lawrence on account arising under his guarantor agreements with various banks, and lending institutions, on behalf of Blackheart International, LLC, as its Guarantor, and Purchaser agrees immediately after closing to execute agreements securing such indemnity to Erik D. Lawrence and as practical to as soon as possible remove him as Guarantor under outstanding debts of Blackheart International, LLC.

The June 1, 2013, Agreement further stated:

> That Steaphan Weir and Brace Barber, hereby agrees [sic] to personally and individually guarantee the performance of all obligations, payments and debts owed under the Agreements and this Agreement, by the Acquiring Company as if their own, in the same standing as the Acquiring Company if the Acquiring Company fails to perform the same when due.

After Barber took control of Blackheart, Barber did not remove Lawrence as guarantor, and the credit cards continued to be used by Blackheart employees under Barber's direction. Barber testified that he was in the process of having himself put on the

9

cards as guarantor. When Lawrence asked why he had not been removed as guarantor of the credit card accounts, Barber responded that he was working on it. Lawrence testified that Barber had bad credit and was unable to have himself put on the credit cards in a timely fashion. Barber never removed Lawrence as guarantor, and his employees continued making charges that increased Lawrence's liability. Lawrence eventually paid over $30,000 to pay off the credit card purchases made by employees of Blackheart after the business transaction between Barber and Lawrence closed. Barber has not reimbursed Lawrence for these expenses.

## F. PERSONAL PROPERTY

In a separate agreement, dated April 1, 2013 ("Lease Agreement"), Lawrence, through his company Philippi, leased the first floor of his warehouse located in Barbour County, West Virginia, to Blackheart to be used for business purposes. As part of the Lease Agreement, Lawrence entrusted Blackheart with various personal property items worth $3045. These items were located inside the first floor of the warehouse that belonged to Lawrence and/or Philippi. Such items included a spotting scope, books, and furniture. Lawrence and Barber agreed to place colored stickers on the items that belonged to Lawrence or Philippi. According to Lawrence's testimony, when Blackheart moved its operations out of the warehouse, items marked as belonging to Lawrence and Philippi were removed by Blackheart employees and never returned. Barber was not present when the personal property items were removed. Lawrence alleges that Barber specifically directed

the employees to remove the personal property that belonged to Lawrence and Philippi. None of the Blackheart employees testified.

## G. PRIOR JUDGMENT

On May 1, 2014, Lawrence filed a complaint against General Stability, Blackheart, Weir, John Aliveto, and Barber in the Circuit Court of Barbour County, West Virginia. The complaint included claims for breach of contract, conversion with regard to credit, and conversion of personal property. On April 25, 2016, Lawrence received a judgment against the Defendants for $6.5 million, which also included awards for claims not at issue in this adversary proceeding. Judgment, however, was not entered against Barber because he filed for bankruptcy protection. Lawrence subsequently filed a proof of claim in Barber's underlying bankruptcy case in the amount of $5,903,376.87 based on the Barbour County complaint.

## II. NONDISCHARGEABILITY

## A. NONDISCHARGEABILIY, GENERALLY

Exceptions to discharge are to be strictly construed. ***Gleason v. Thaw***, 236 U.S. 558, 562 (1915). The burden of proof falls upon the party objecting to discharge to prove by a preponderance of the evidence that a particular debt is nondischargeable. ***Grogan v. Garner***, 498 U.S. 279, 291 (1991).

## B. 11 U.S.C. § 523(a)(4)

Under 11 U.S.C. § 523(a)(4), a discharge can be denied for a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Section 523(a)(4) creates two distinct exceptions to discharge: (1) fraud or defalcation while acting in a fiduciary capacity, and (2) embezzlement or larceny whether or not acting in a fiduciary capacity. *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982) (citations omitted).

### 1. Fraud or Defalcation While Acting in a Fiduciary Capacity

A finding of "fraud or defalcation while acting in a fiduciary capacity" under 11 U.S.C. § 523(a)(4) requires the following: "(1) a pre-existing fiduciary relationship, (2) a breach of that relationship, and (3) resulting loss." *Patel v. Shamrock Floorcovering Servs., Inc. (In re Patel)*, 565 F.3d 963, 968 (6th Cir. 2009) (citing *Bd. of Trustees of the Ohio Carpenters' Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir. 2007)).

In the Sixth Circuit, the defalcation provision of this section is limited only to "'those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor.'" *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 391 (6th Cir. 2005) (quoting *R.E. Am., Inc. v. Garver (In re Garver)*, 116 F.3d 176, 180 (6th Cir. 1997)). "It is well established that the defalcation provision of § 523(a)(4) applies to express or technical trusts, but not to

12

constructive trusts that courts may impose as an equitable remedy." *Id*. (citation omitted). "This rule is limited to a trust relationship arising from the placement of a specific res in the hands of the debtor." ***Astro Bldg. Supplies, Inc. v. Slavik***, 443 Fed. App'x 993 (6th Cir. 2011). "To establish the existence of an express or technical trust, a creditor must demonstrate: '(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.'" ***In re Bucci***, 493 F.3d 635, 640 (quoting ***In re Blaszak***, 397 F.3d at 391–92). Further, there is no breach of fiduciary duty where a debtor is authorized to take the action taken. *See **King's Welding & Fabricating, Inc. v. King***, No. 5:11CV1792, 2012 WL 3732514, at *10 (N.D. Ohio Aug. 27, 2012).


Defalcation in a fiduciary capacity requires mental culpability, which is described as a state of mind "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." ***Bullock v. BankChampaign, N.A.***, 569 U.S. 267, 269 (2013). Where actual knowledge is lacking, the ***Bullock*** Court found that intent can still be shown for purposes of 11 U.S.C. § 523(a)(4) "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id*. at 274 (citation omitted).


### 2. Embezzlement

Embezzlement under 11 U.S.C. § 523(a)(4) is defined as "'the fraudulent appropriation of property by a person to whom such property has been entrusted or into

Case 3:16-ap-90268   Doc 75   Filed 08/09/19   Entered 08/09/19 11:34:19   Desc Main
Document      Page 13 of 25

whose hands it has lawfully come.'" ***Brady v. McAllister (In re Brady)***, 101 F.3d 1165, 1172–73 (6th Cir. 1996) (quoting ***In re Carlton***, 26 B.R. 202, 205).

In order to prove embezzlement under 11 U.S.C. § 523(a)(4), a creditor must show "that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." ***In re Brady***, 101 F.3d at 1173 (citation omitted).  "Embezzlement differs from larceny in that the embezzler's initial acquisition of the property is lawful." ***Baker v. Wentland (In re Wentland)***, 410 B.R. 585, 596 (Bankr. N.D. Ohio 2009).

The fraud element may be satisfied by a showing of deceit. ***See Nat'l City Bank v. Imbody (In re Imbody)***, 104 B.R. 830, 841 (Bankr. N.D. Ohio 1989) (citations omitted) ("[m]ost courts that have considered the issue have held that acting with deceit will satisfy the fraudulent intent requirement" of embezzlement). The fraud element of 11 U.S.C. § 523(a)(4) is "fraud in fact, involving moral turpitude or *intentional* wrong" and requires "proof of the debtor's fraudulent intent in taking the [creditor's] property." ***Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)***, 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007) (citations omitted).

The requisite fraudulent intent may be established by circumstantial evidence. ***Id.*** (citing ***WebMD Servs., Inc. v. Sedlacek (In re Sedlacek)***, 327 B.R. 872, 880-81 (Bankr.

E.D. Tenn. 2005)). Misrepresentations, omissions, or concealment of actions are circumstances which might "illuminate a debtor's fraudulent intent." *Id.* at 117 (citations omitted). However, evidence "that the debtor used the [creditor's property] openly, without attempting to conceal, and had reasonable grounds to believe he had the right to so use" might suggest that the debtor lacked fraudulent intent. *Id.* (citation omitted).

### C. 11 U.S.C. § 523(a)(6)

Pursuant to 11 U.S.C. § 523(a)(6), a debt is nondischargeable when the debt is "for willful and malicious injury by the debtor to another entity or to the property of another entity." For 11 U.S.C. § 523(a)(6) to apply, the debtor must "will or desire harm" or "believe injury is substantially certain to occur as a result of his behavior." *Sanderson Farms, Inc. v. Gasbarro*, 299 Fed. App'x 499, 504 (6th Cir. 2008) (quoting *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 465 n.10 (6th Cir. 1999)). "[D]ebts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." *Kawaauhau v. Geiger,* 523 U.S. 57, 64 (1998).

In order to find "willful and malicious injury," the movant must show that the debtor "(1) intended to cause injury to the Creditor or to the Creditor's property, or (2) engaged in an intentional act from which the Debtor believed injury would be substantially certain to result." *Call Fed. Credit Union v. Sweeney (In re Sweeney)*, 264 B.R. 866, 871 (Bankr. W.D. Ky. 2001) (citing *In re Markowitz*, 190 F.3d 455, 464). The Sixth Circuit applies one single test for whether an injury was "willful and malicious" rather than considering

"willful" and "malicious" as separate elements. ***Marketgraphics Research Group, Inc. v. Berge,*** 245 F. Supp. 3d 973, 977 (M.D. Tenn. 2017).

## III.  CONCLUSIONS OF LAW

### A.  Guns

Plaintiffs allege that Barber's debt for the converted guns is nondischargeable under 11 U.S.C. §§ 523(a)(4) and (a)(6).  The Court finds that the Barber caused Blackheart to wrongfully retain the guns despite his knowledge of an agreement between Hickman and Lawrence and their requests that he return the guns.

The evidence established that the guns were merely entrusted to Blackheart, and in fact, Lawrence and Vigilant owned the guns.  Per the agreement between Hickman and Lawrence, Blackheart was to store the guns while Vigilant's FFL application was being processed.  At no point in time did Blackheart's storage of the guns denote ownership. When Vigilant's FFL was finalized in December 2013, the guns were to be available to Lawrence to be used by Vigilant.

Barber's testimony at trial was contradictory and confusing.  He testified several times that he believed the guns were the property of Blackheart, that he never considered the weapons to be on loan, and that he never understood that Hickman intended the guns to be transferred to Lawrence.  Yet, Barber admitted receiving an email from Hickman, dated March 26, 2014, in which Hickman states that the guns were to go to Lawrence and

16

not Blackheart. Hickman specifically stated that the guns "are in no way part of the [Blackheart] purchase from [Lawrence]." By receiving this email, Barber was clearly on notice that the guns were never a part of the Blackheart purchase and that the guns were to be transferred to Lawrence to be used by Vigilant as soon as Vigilant obtained its license and Barber completed the transfer paperwork. Vigilant became licensed on December 30, 2013.

The contradictions in Barber's testimony do not end there. Barber sent an email to Hickman on March 23, 2015, claiming that he had started the paperwork to have the guns transferred. When asked about this email, Barber testified that he had just learned about Hickman's intent regarding ownership of the guns despite having received Hickman's email from the previous year. In an email to Barber that same day, Cornejo told Barber that "from the ATF's standpoint . . . they were technically on loan." When explaining the email at trial, Barber claimed that the email represented the opinion of Cornejo, but Barber never considered the guns to be on loan. Barber's testimony regarding ownership of the guns was contradictory, self-serving, and lacked credibility. The conclusion that Barber and Blackheart were only storing the guns for the benefit of Lawrence and Vigilant until the transfer paperwork was completed was uncontradicted by any credible evidence.

Even Barber's statement that he had started the paperwork to transfer the sixteen guns to Lawrence was untrue. Barber never prepared the paperwork for the guns to be transferred to Lawrence. Moreover, even after Barber's March 23, 2015, email indicating

that he had started the paperwork, there was continued email conversations between Barber and Blackheart employees in May 2015 regarding the benefits of keeping the guns rather than returning them.

At trial it was also established that Barber provided false information about the guns under oath in his interrogatory responses. In response to Interrogatory No. 12, Barber stated that on May 12, 2015, the guns were seized by Viqen, a creditor of Blackheart. Barber further stated in response to Interrogatory No. 12 that the transfer to Viqen was the "last I have first-hand knowledge regarding the location of the weapons." This testimony was also lacking in credibility. As shown at trial, on May 17, 2015, five days after the alleged seizure, Barber wrote an email to his employees indicating that Blackheart still had the guns in its vault. Furthermore, on July 23, 2015, more than two months after the alleged seizure by Viqen, Barber emailed Hickman stating the guns were still in Blackheart's vault. Barber, thus, knew the guns were still in Blackheart's vault months after he stated under oath that the guns had been seized by Viqen.

Moreover, Barber's responses were notarized on May 15, 2017, almost two years after Barber had further knowledge regarding the location of the guns. After failing to explain the inconsistent statements during his testimony, Barber finally admitted that "[i]f I was corresponding after that date, clearly I had knowledge of where the guns were at that time."

The evidence at trial also contradicts Barber's testimony that he did nothing to keep the guns from Lawrence. Even though he knew of the agreement between Lawrence and Hickman that the guns belonged to Lawrence, Barber did not transfer the guns. Rather, Barber continuously made up excuses why the guns could not be transferred. The evidence shows that Barber did not fulfill his promise to submit the paperwork to have the guns transferred because he did not want Lawrence to have the guns. Specifically, Barber and his employees did not want to do anything that would profit Lawrence or enhance Lawrence's reputation. The evidence further shows Barber did not transfer the guns to Lawrence because Blackheart wanted to use the guns for future financial gain. Barber even suggested one way in which Blackheart could use them for its own financial gain would be for Blackheart to retain the guns and rent them to Lawrence and Vigilant instead of returning the guns to Lawrence as Hickman and Lawrence had agreed.

As a last attempt to receive the guns, Lawrence and Hickman discussed that the guns could be "cut" and returned as parts. Hickman sent an email to Barber indicating that he had decided to have his people come to Blackheart and destroy the weapons. In response, Barber copied the email to his employees and told them not to communicate with Hickman. He also asked his employees why Hickman would want to destroy the weapons. Barber answered himself that the purpose must be to deny Blackheart the use of the weapons and to hurt Blackheart financially and to damage its credibility. Barber's questions show that he had no intention of complying with Hickman's decision to send individuals to Blackheart for the purpose of destroying the weapons. In addition, Cornejo pointed out in

a later email to Newton and Barber that if the weapons were not destroyed, they would eventually generate cash flow for Blackheart. The guns were never returned to Hickman and/or Lawrence, either intact, or as parts.

This Court had the opportunity to observe witnesses on the stand, assess their demeanor, and review evidence. *Kelly v. Mace (In re Mace),* 573 Fed. App'x 490, 496 (6th Cir. 2014). In the present case, Barber's credibility as a witness was lacking and weighs heavily against his testimony.

Under 11 U.S.C. § 523(a)(4), the Court finds that Barber embezzled the guns. Specifically, the proof shows that the guns were entrusted to Barber and that he appropriated the guns, refusing to turn the guns over to Lawrence or to start the paperwork necessary to do so. Moreover, the evidence shows that Barber's actions were deceitful. He disregarded the agreement and requests of both Hickman and Lawrence concerning the ownership and disposition of the guns, and he continually gave contradictory answers regarding the preparation of the paperwork and the location of the guns.

The value of the guns is nondischargeable under 11 U.S.C. § 523(a)(6) because Barber willfully and maliciously failed to transfer the guns to Lawrence, which resulted in a financial injury to Lawrence. *See Markowitz*, 190 F.3d 455, 464. The proof reflects that

by keeping the guns, Barber either intended to injure Lawrence financially or he knew that injury would be substantially certain.

Based on the uncontroverted proof regarding the value of the guns, Lawrence's trial testimony and Hickman's deposition, the guns would have a value of $70,000. Accordingly, the Court finds that the value of the guns, $70,000, is nondischargable under both 11 U.S.C. §§ 523(a)(4) and (a)(6).

## B. Use of Credit Cards

Plaintiffs allege that Barber's continued use of the business credit cards is also grounds for nondischargeability under both 11 U.S.C. §§ 523(a)(4) and (a)(6).

As part of the Buy Sell Agreement, it was agreed that Blackheart's credit cards would continue to be used for approved business purchases and that Barber would assume the role as guarantor for each of the accounts. It was further agreed that Barber would pay on behalf of Lawrence any charges made on the accounts before Barber took over as guarantor. After Barber took control of Blackheart, Barber did not remove Lawrence as guarantor, and the credit cards continued to be used by Blackheart employees under Barber's direction. There was no timeline set out in the agreement regarding when Lawrence was to be removed as guarantor, and this arrangement was made because Barber had bad credit and was unable to immediately name himself as guarantor. In fact, the

agreement only required Barber to remove Lawrence as guarantor on the business credit cards "as practical to as soon as possible."

Under the embezzlement theory, Plaintiffs have not proved that Barber misappropriated funds. The Buy Sell Agreement clearly provided that the credit cards would continue to be used for approved business purchases, and there was no proof that the credit cards were used for any other purpose. Plaintiffs also argue that the credit card debt is nondischargable due to defalcation while acting in a fiduciary capacity. Again, there was no proof that the credit cards were used for unapproved non-business purchases. Instead, Lawrence relies on Barber's delay in having Lawrence removed as guarantor on the cards and Barber's failure to indemnify Lawrence on purchases made. Lawrence knew Barber had poor credit, and the agreement did not set out a specific deadline for removing Lawrence as guarantor. In fact, Lawrence admitted at trial that "Brace and I agreed the cards would continue to be used while he attempted to get financing," and there is no proof that the debtor was ever able to obtain such financing.

Finally, under the willful and malicious theory, Barber must be shown to have intended the injury to Lawrence with respect to the credit cards. Plaintiffs argue that Barber's purchases were intentionally and willfully charged on the credit cards with full knowledge that Lawrence remained liable. While that is true, it is not enough that Barber intended to act, he must have intended the harm and consequence of his actions. The Buy Sell Agreement that bound all the relevant parties envisioned the continued use of the credit

cards and contemplated that Barber would not immediately replace Lawrence as guarantor. There was simply no proof that Barber continued to use the credit cards for business purchases with the intent of not indemnifying Lawrence nor was there proof that Barber had not attempted to have Lawrence removed as guarantor. If anything, Barber's failure to indemnify and/or remove Lawrence as guarantor was a breach of contract rather than a nondischargable act under 11 U.S.C. §§ 523(a)(4) and (a)(6).

Accordingly, the Court finds that the credit card debt is not exempted from discharge under either 11 U.S.C. §§ 523(a)(4) or 523(a)(6).

## C. The "Theft" of Personal Property

Plaintiffs argue that the value of the personal property removed from warehouse space by Blackheart employees is nondischargeable under 11 U.S.C. §§ 523(a)(4) and 523(a)(6). Under 11 U.S.C. § 523(a)(4), Plaintiffs allege that Barber, acting through Blackheart employees, embezzled Lawrence's property. Plaintiffs also allege under 11 U.S.C. § 523(a)(6) that Barber, acting through Blackheart employees, willfully and maliciously removed Lawrence's property knowing the property belonged to Lawrence. The property was never returned, and based on the proof, the property had a value of $3045.

Lawrence leased the first floor of his warehouse to Blackheart. As part of the lease, Plaintiffs entrusted Blackheart with various personal property items worth $3045 that were located inside the first floor of the warehouse. Lawrence and Barber agreed to place

colored stickers on the items that belonged to Plaintiffs. When Blackheart moved its operations out of the warehouse, items marked as belonging to Plaintiffs were to remain in the warehouse, but as stated, these items were removed at some point and never returned.

The proof established that the personal property was entrusted to Barber, as owner of Blackheart, and that the property was removed from the warehouse and never returned to Lawrence. Barber was not present when the personal property was removed from the warehouse, and there was no admissible proof showing that Barber directed his employees to remove or steal Plaintiffs' property.[5] Accordingly, the Court finds that Plaintiffs have not met their burden to show that this debt is excepted from discharge under 11 U.S.C. § 523(a)(4).

The same is true with regards to Plaintiffs' assertion that this debt is nondischargeable under 11 U.S.C. § 523(a)(6). There was no admissible proof that Barber instructed his employees to steal Plaintiffs' property from the warehouse, and even if the Court assumes Barber gave instructions to his employees regarding the removal of Plaintiffs' property, proof that such instruction was willful and malicious rather than the result of recklessness or negligence was required. Accordingly, the Court finds that this debt is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

---

[5]Lawrence's testimony as to what Blackheart employees told him was inadmissible hearsay.

## IV. CONCLUSION

For the reasons stated, the Court finds that the only nondischargeable debt is the value of the guns, $70,000, which is nondischargable under both 11 U.S.C. §§ 523(a)(4) and (a)(6).

An appropriate order will enter.

**This Memorandum Opinion was signed and entered electronically as indicated at the top of the first page.**

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.